IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 8:06CR116 |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | REPORT AND |
| LAVELLE GILES, ) | RECOMMENDATION |
| ) | |
| Defendant. ) | |

This case is before the court on the Motion to Suppress Evidence (#91) filed by Lavelle Giles. The motion was heard on September 20, 2006. The Transcript of the proceedings (#179) was filed on October 9, 2006 and the motion was deemed submitted.

The defendant alleges the stop of his truck on April 4, 2006 occurred without reasonable suspicion of criminal activity and he was arrested without probable cause. Thus, he contends that his post-arrest statements should be suppressed as fruits of the illegal stop and arrest. He also asserts that statements he made were obtained in violation of his rights under *Miranda* and the Fifth and Sixth Amendments to the United States Constitution.

The government counters that the defendant was lawfully stopped after he fled to avoid arrest and that probable cause existed to believe he was driving under the influence and with a suspended license. The government also claims there is no violation of *Miranda* or the defendant's Fifth or Sixth Amendment rights, because he voluntarily, knowingly, and intelligently waived his rights.

## FACTUAL BACKGROUND

Cynthia Johnston testified she is a 20-year veteran of the Omaha Police Department. On April 4, 2006 she was on duty in uniform and operating a marked police vehicle (9:16-22). Her assignment that day was at the Crown Point storage facility at 75th and Crown Point, where she was to identify individuals who came to the storage facility while other officers executed search warrants at the location.

At approximately 12:43 as Johnston sat in her cruiser near the locked gate to the facility, she observed a white extended-cab truck containing four males, pull up next to her driver's side door (8:5-17). She recognized the driver, Dale Giles, from mug shot photos she had received earlier in the day (9:5-10). Dale Giles asked her if he could go into the storage area. She told him that there was a water main break and that MUD was at the facility and no one was being let in (9:11-15). Dale Giles responded, "never mind, I'll come back later." Dale Giles then drove the truck around the back of the cruiser and traveled east on Crown Point. Johnston followed in her cruiser, activating her lights and siren in an attempt to stop the truck (10:1-13). The truck pulled in to the Scandinavian Hall and came to a stop. As Johnston positioned her cruiser near the truck, Dale Giles opened the driver's door, shut it quickly, and the truck accelerated away (11:1-17). Johnston, to avoid a collision, backed her cruiser up (11:18-23). The truck traveled in a westbound direction followed by Johnston. Johnston estimated that the truck was traveling about 54 mph, which was in excess of the posted speed limit (12:9-18).

Johnston testified she advised police officers by radio that the truck was traveling through 79th and Crown Point toward 79th and Military. The truck then make an abrupt lefthand turn and came to a stop. Dale Giles exited the truck, put his hands in the air and laid on the ground, while the passenger slid to the driver's seat and drove away (13:20-14:4). Johnston radioed other officers the license plate number of the truck and that it now had three occupants (16:16-21).

On cross-examination Johnston testified that as part of her assignment at the storage unit she was given photographs of individuals who were "players" involved in the investigation and that she had identified three of the occupants of the truck as Dale Giles, Lavelle Giles, and "Snoddy" with the aid of those pictures (19:9-16).

Lavora Beaunea testified she is a 24-year veteran of the Omaha Police Department, currently assigned to uniform patrol. On May (sic) 4th, 2006 between 12:30 and 12:40 while on duty, she observed a white Ford pickup truck she believed, based on a radio transmission, had been involved in an officer pursuit and an attempt to run down another officer (25:17-22). Beaunea observed the pickup truck near 72nd and Military and followed it to a parking lot of a Baker's Supermarket. She turned on her lights in an attempt to stop the truck, however, the truck did not stop. She observed two occupants, both in the front seat, and she identified the driver as the defendant, Lavelle Giles (27:12-23). After relaying her information over the radio, she received information from the police helicopter to back off the truck, which she did (26:7-17).

Beaunea testified that after she was told to back off, she continued to watch the truck and she observed it enter the parking lot of the Burger King at 60th and Ames (28:6-16). However, by the time she entered the lot, other law enforcement officers had stopped the truck and were conducting a felony-risk stop (28:19-25). Beaunea described a felony-risk stop as a stop where law enforcement officers' guns are drawn, more than one law enforcement vehicle is involved, and the occupants are removed from their vehicle (29:1-5).

On cross-examination, Beaunea testified that the video recording device in her cruiser was not working, and although her cruiser was fairly new, the device had not been working for quite awhile (30:10-19). She admitted that during her observations of the truck, she did not see any law violations (31:20-23). She also admitted that no one at the scene of the arrest informed her that the defendant may have been intoxicated (33:3-7).

Rodney Henderson testified that he is a two-year veteran of the Omaha Police Department assigned to the uniform patrol division. On April 4, 2006 he was working in the area of 48th and Ames when he heard a broadcast by Johnston that she was in pursuit or had been nearly rammed by a white Ford F-150, license plate POD-(Paul-Ocean-David) 597 or 579 (35:4-11). After hearing the broadcast, he went to the area of 70th and Ames where he heard another broadcast, this time from Beaunea, that she had the truck in front of her and was trying to stop it but that it would not stop. He also heard the helicopter unit inform all units that they should back off (35:4-20). While he took no part in the earlier attempts to stop

the truck, he did stop it in the drive-through area of the Burger King by conducting a high-risk traffic stop (37:4-14).

Henderson testified he had the driver, who he identified as the defendant (38:15-20), put his hands out the window, open the door from the outside, and walk towards his voice (38:21-25). Henderson admitted that prior to the stop he knew nothing about the initial happenings at the Crown Point area, except that he had heard Johnston screaming over the radio that a truck was trying to ram her (40:3-8).[1]

Henderson testified that while he had no additional contact with the defendant at the scene, he did have contact with him later at the central headquarters while the defendant was in an interrogation room waiting for a detective to come and speak with him (40:17-41:3). Henderson noted that he recalled hearing a loud noise, a boom, a thud on the ground or on the floor. He opened the door to the room and saw the defendant laying on the floor, observed the defendant was not acting normal, and came to the conclusion that he had been drinking or was under the influence (41:9-15). As a result of the defendant's behavior, a preliminary breath test (PBT) was conducted resulting in a reading of .103 (41:17-18). Following the PBT test an intoxilyzer test was given, resulting in a reading of .083 (43:4-5).

On cross-examination Henderson testified that at the scene of the arrest he identified the defendant as the driver of the trick, but at that time did not know his name (49:9-15).

---

[1] During the hearing on the motion, I took judicial notice of Nebraska statutes 28-905, Operating a Motor Vehicle or Vessel to Avoid Arrest; 60-6,196 Driving Under the Influence of Alcoholic Liquor or Drug; and 60,4-108 Operating Motor Vehicle During a Period of Suspension, Revocation or Impoundment.

Officer Brian Bogdanoff testified that he is an 18-year employee of the Omaha Police Department. On April 4, 2006 he had contact with the defendant in an interview room at the Omaha central police headquarters at approximately 5:30 (53:12-17). He and the defendant sat at a table and Bogdanoff read the defendant his rights using a Rights Advisory Form (Ex. 24). He asked the defendant each of the questions on the form and recorded the answer on the exhibit (54:10-55:1). In response to the question, "knowing your rights, are you willing to talk to me now?", the defendant responded, "go on ahead." (55:5-9).[2] Bogdanoff informed the defendant he had a lot of evidence that had been recovered that involved his brother and he informed him about the search warrants that were served that day. He did not promise the defendant anything in exchange for his statement or threaten or coerce him in any manner (56:7-11). At no time did the defendant request a lawyer (56:3-6). Bogdanoff noted that the interview with the defendant was recorded (Ex. 23) and lasted about 22 minutes (58:2-19).

On cross-examination Bogdanoff admitted that prior to the defendant's arrest on April 4, the defendant was not a suspect or person of interest in the investigation. He also admitted that it would be a fair conclusion that officers involved in the surveillance at the rental units would not have a mug shot of the defendant (68:20-69:6).

---

[2] I have viewed Exhibit 23 and find that the defendant, after being advised of his *Miranda* rights, states that he will make a statement but that if he does not want to answer a question he, "just would not answer that one." (Ex.23, 5:30).

## LEGAL ANALYSIS

### A.  Legality of Traffic Stop

"For purposes of constitutional analysis, a traffic stop is characterized as an investigative detention, rather than a custodial arrest." *United States v. Jones*, 269 F.3d 919, 924 (8th Cir. 2001); *see United States v. Wheat*, 278 F.3d 722, 726 (8th Cir. 2001), *cert. denied*, 537 U.S. 850 (2002).  As such, a traffic stop is governed by the principles of *Terry v. Ohio*, 392 U.S. 1 (1968). *Jones*, 269 F.3d at 924.  Under *Terry,* 392 U.S. at 21-22, a police officer may conduct an investigative stop if the officer has a reasonable suspicion that the person stopped is, or is about to be, engaged in criminal activity. *See also Delaware v. Prouse*, 440 U.S. 648, 663 (1979).  Reasonable suspicion requires a particularized and objective basis for suspecting the person stopped of criminal activity, but the level of suspicion required for a *Terry* stop is less demanding than that for probable cause. *United States v. Gonzalez*, 220 F.3d 922, 925 (8th Cir. 2000) (internal quotations and citations omitted).  "A reasonable suspicion may be justified even if there are innocent explanations for a defendant's behavior when the circumstances are considered in the totality." *United States v. Tuley*, 161 F.3d 513, 515 (8th Cir. 1998).  Even "[a] mistaken premise can furnish grounds for a *Terry* stop, if the officers do not know that it is mistaken and are reasonable in acting upon it." *United States v. Ornelas-Ledesma*, 16 F.3d 714, 718 (7th Cir. 1994), *judgment vacated on other grounds*, 517 U.S. 690 (1996) (citing *Illinois v. Rodriguez*, 497 U.S. 177, 184-86 (1990)); *accord United States v. Bailey*, 417 F.3d 873, 977 (8th Cir. 2005);

*see also United States v. DeLeon-Reyna*, 930 F.2d 396, 399 (5th Cir. 1991) (en banc) (per curiam); and *United States v. Walraven*, 892 F.2d 972, 974-75 (10th Cir. 1989)).

I conclude that Officer Henderson had an objectively reasonable basis for believing a traffic offense had occurred. Any mistake of fact or mistake of law on his part, therefore, does not affect the validity of the traffic stop.

> Within the Eighth Circuit,
>
> the distinction between a mistake of law and a mistake of fact is irrelevant to the fourth amendment inquiry. As we held in *United States v. Sanders*, 196 F.3d 910, 913 & n.3 (8th Cir. 1999), the validity of a stop depends on whether the officer's actions were objectively reasonable in the circumstances, and in mistake cases the question is simply whether the mistake, whether of law or of fact, was an objectively reasonable one. "The determination of whether probable cause [or reasonable suspicion] existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." *Id.* at 913.

*United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005); *see also United States v. Martin*, 411 F.3d 998, 1101 (8th Cir. 2005).

In this case, Officer Henderson's stop of the truck was objectively reasonable based upon his belief that the truck had just been involved in an attempted ramming of an occupied police cruiser and had fled the scene to avoid arrest. I find Henderson's testimony to be credible. I further find that action in stopping defendant's truck for a violation of Neb. Rev. Stat. § 28-905, operating a motor vehicle or vessel to avoid arrest, was objectively reasonable.

### B. *Miranda.*

The protections of *Miranda v. Arizona*, 384 U.S. 436 (1966), "are triggered only when a defendant is both in custody and being interrogated. *United States v. Lawrence,* 952 F.2d 1034, 1036 (8th Cir.), *cert. denied*, 503 U.S. 1011 (1992). 'Interrogation' is 'express questioning,' or words or actions 'that the police should know are reasonably likely to elicit an incriminating response....' *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *Lawrence,* 952 F.2d at 1036...." *United States v. Hatten*, 68 F.3d 257, 261-62 (8th Cir. 1995), *cert. denied,* 516 U.S. 1150 (1996) (parallel citations omitted); *see also United States v. Boyd*, 180 F.3d 967, 976-77 (8th Cir. 1999); *United States v. Head*, 407 F.3d 925, 929 (8th Cir. 2005).

"A *Miranda* warning must precede any custodial interrogation. A custodial interrogation involves questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *United States v. Chamberlain*, 163 F.3d 499, 502 (8th Cir. 1999) (citing *Miranda v. Arizona*, 384 U.S. 436 (1966)).

The government bears the burden of proving by a preponderance of the evidence that, under the particular facts and circumstances of this case, the defendant's waiver of his *Miranda* rights was "an intentional, voluntary, knowing, and intelligent relinquishment or abandonment of a known right or privilege." *United States v. Black Bear*, 422 F.3d 658, 663 (8th Cir. 2005). "To determine whether a waiver or a confession was voluntary, a court looks at the totality of the circumstances and must determine whether the individual's will was

overborne." *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002). The court must examine both "'the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess.'" *Id.* (quoting *United States v. McClinton*, 982 F.2d 278, 282 (8th Cir. 1992)).

> To state the obvious, "interrogation of a suspect will involve some pressure because its purpose is to elicit a confession." ... [T]he fact that the tactics produced the intended result ... does not make [a] confession involuntary." ... In other words, "there is nothing inherently wrong with efforts to create a favorable climate for confession." ... "'[Q]uestioning tactics such as a raised voice, deception, or a sympathetic attitude on the part of the interrogator will not render a confession involuntary unless the overall impact of the interrogation caused the defendant's will to be overborne.'" ... Nor will a promise of leniency, an "expressed disbelief in the statements of a suspect ..., or lie[s] to the accused about the evidence against him" necessarily render a confession involuntary.... Rather, the coercive conduct must be "such that the defendant's will was overborne and his capacity for self-determination critically impaired."

*United States v. Santos-Garcia*, 313 F.3d 1073, 1079 (8th Cir. 2002) (citations omitted).

Regarding the statements made at the Omaha police central headquarters, I find the defendant was advised of his constitutional rights pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966), and that there is no evidence he did not understand the advice of rights. In this case the defendant was in custody and was questioned by Bogdanoff. The records, including the videotape (Ex. 23), clearly demonstrate that the defendant, after being advised of his right, agreed to be interviewed. The record shows no evidence of threat, promise, or coercion. I find Bogdanoff's testimony to be credible and consistent with my viewing of

-10-

Exhibit 23. I find that the defendant was advised of his *Miranda* rights, and that he freely, voluntarily, and intelligently waived his rights, and gave a statement.

## RECOMMENDATION

In summary, I find that for the foregoing reasons, the defendant's Motion to Suppress should be denied.

**IT IS RECOMMENDED** that defendant's MOTION TO SUPPRESS (#91) be denied.

Pursuant to NECrimR 57.3, a party may object to this Report and Recommendation by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten (10) days after being served with the recommendation. The statement of objection shall specify those portions of the recommendation to which the party objects and the basis of the objection. The objecting party shall file contemporaneously with the statement of objection a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.

**DATED November 3, 2006.**

        **BY THE COURT:**

        **s/ F.A. Gossett**
        **United States Magistrate Judge**